UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**A.H., by and through his parent, M.C.**

**Plaintiff,**

**v.**

**DISTRICT OF COLUMBIA** *et al.*,

**Defendants.**

**Case No. 24-cv-3598 (BAH) (GMH)**

**MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Plaintiff filed an administrative complaint against the District of Columbia under the Individuals with Disabilities Education Act ("IDEA") on behalf of her son, A.H., a student with a disability in District of Columbia Public Schools. The complaint alleged numerous violations of the IDEA. Following a three-day administrative hearing, the hearing officer rejected most of Plaintiff's claims but found three violations of the IDEA and awarded 225 of the 2,800 hours of compensatory education Plaintiff requested. In her federal complaint, Plaintiff seeks judicial review of the hearing officer's decision. Because the hearing officer failed adequately to explain the conclusion that A.H. was not entitled to extended school year services and the calculation of compensatory education, the undersigned recommends remanding this matter for additional proceedings.[1]

---

[1] The relevant docket entries for the purposes of this Report and Recommendation are: (1) the administrative record, ECF No. 11-1; (2) Plaintiff's motion for summary judgment, ECF No. 14; (3) Defendants' cross-motion for summary judgment and opposition to Plaintiff's motion, ECF No. 20; (4) Plaintiff's reply in support of her motion and opposition to Defendants' cross-motion, ECF No. 22; and (5) Defendants' reply in support of its cross-motion, ECF No. 25. The page numbers cited herein are those assigned by the Court's CM/ECF system.

## I.     BACKGROUND

### A.     Statutory Background

The IDEA guarantees to children with disabilities "a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A); *see id.* § 1401(9). To do so, the IDEA requires school districts to create and implement an Individualized Education Plan ("IEP") providing the services needed to meet the student's particular needs. *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 368 (1985); 20 U.S.C. § 1414(d)(1)(A)–(2)(A). The student's parents, teachers, and other educational specialists form the student's IEP team, and together must design the student's IEP. 20 U.S.C. § 1414(d)(1)(B). The IEP they develop must contain assessments of the student's needs, strategies to meet those needs, and goals used to measure the effectiveness of the plan. 20 U.S.C. § 1414(d)(1)(A). Once an IEP is created, the school district must review and revise the student's IEP at least annually to ensure the child's goals are being achieved. 20 U.S.C. § 1414(d)(4)(A)(i)-(ii); 34 C.F.R. 300.324(b)(ii).

To provide a FAPE, an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). The IEP must be based on "careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* at 400 (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(IV), (d)(3)(A)(i)–(iv)). And it "must aim to enable the child to make progress" based on the child's "unique needs." *Id.* at 399–400 (emphasis omitted) (quoting 20 U.S.C. §§ 1401(29)). At the same time, the IDEA mandates that children with disabilities be placed in the "least restrictive environment" so that they can be educated alongside their peers in "the regular educational environment" to "the maximum extent appropriate." *See* 20 U.S.C. § 1412(a)(5)(A).

2

A parent who believes their child has been denied a FAPE may request a "due process hearing" before an independent hearing officer. 20 U.S.C. § 1415(f)(1). At the due process hearing, the parent may be represented by counsel, present evidence, and examine witnesses. *Id.* § 1415(h). After considering the evidence, the hearing officer must issue a written decision determining "whether the child received a free appropriate public education." *Id.* § 1415(f)(3)(E)(i); *see also id.* § 1415(h)(4). A parent "aggrieved by" the hearing officer's determination may seek judicial review of the decision. *Id.* § 1415(i)(2).

**B.    Factual Background**

The District identified A.H. as a child with a disability when he was in sixth grade in 2019. ECF No. 11-1 at 11. After a psychological examination, A.H. was found to have indications for specific learning disorders for reading, math, spelling, and writing; disruptive mood dysregulation disorder; attention deficit hyperactivity disorder, and "other specified trauma and stressor related disorder." *Id.* at 31, 198 (some capitalization omitted). The District classified A.H. as having an "Emotional Disability." *Id.* at 8. The District's formal evaluation of A.H.'s academic achievement when he was in sixth grade in 2019 revealed that A.H. was well below grade level "in nearly every academic area." *Id.* at 11. The District also completed a functional behavior assessment in 2021, while A.H. was in eighth grade, "focusing on [him] being off-task and talking" in class. *Id.*

Based on those evaluations, A.H.'s IEP team developed an IEP in January 2022, halfway through his eighth grade year. *Id.* at 8. A.H.'s 2022 IEP provided 22 hours per week of specialized education outside of the general education environment, two hours per month of behavioral support services, and extended school year services to ensure he did not suffer regression over breaks when not in school. *Id.* A.H. was therefore placed in the Behavior Education Support program, a "self-contained" program at his middle school that provided both specialized education and exposure to the general education curriculum. *Id.* at 10, 853. A.H.'s academic evaluations in the 2021–

22 school year showed that A.H. was below grade level across the board. *Id.* at 9–10. A.H. was also provided a behavior intervention plan in February 2022, which included an anticipated revision date of January 2023; however, no revision of the plan was ever completed. *Id.* at 11.

Despite his academic difficulties, A.H. was on track to begin high school in the 2022–23 school year. The District notified Plaintiff in December 2021 that A.H. had been assigned to Dunbar High School, a public DCPS high school. *Id.* at 10, 21. Dunbar would offer much the same type and level of support as A.H.'s middle school, including education in a self-contained specialized program. *Id.* at 10. Unsatisfied with A.H.'s progress in the Behavior Education Support program in middle school, Plaintiff enrolled A.H. at a different public DCPS high school, Ron Brown College Prep High School, for his freshman year of high school in the fall of 2022. *Id.* at 10, 21.

Ron Brown did not have a self-contained special education program and consequently could not implement A.H.'s IEP. *Id.* at 10. The District advised Plaintiff in September 2022 that Dunbar would be a more appropriate placement for A.H. *Id.* A.H. nevertheless remained at Ron Brown for the majority of the 2022–23 school year, his freshman year. *Id.* At Ron Brown, A.H.'s IEP team met in January 2023 to revise his IEP. *Id.* at 8. Like in the prior year's IEP, A.H.'s 2023 IEP provided 22 hours per week of specialized instruction outside of the general education environment and two hours per month of behavioral support services. *Id.* The 2023 IEP did not provide extended school year services, which the District suggested was because A.H. received credit recovery classes over the summer, allowing him to earn credit for classes he previously failed, outside of his IEP. *Id.* at 9, 939–40.

Meanwhile, the District and Plaintiff were looking for a mutually agreeable placement for A.H. which could implement his IEP—again, Ron Brown could not. Throughout much of A.H.'s

freshman year, Plaintiff communicated with a program manager at DCPS about other public schools that could implement A.H.'s IEP. *Id.* at 849–50, 857–58. Among these options was Dunbar, A.H.'s original assignment. *Id.* at 856–57. Dunbar, the program manager explained, "could support [A.H.] in a[] [Specific Learning Support] classroom" where "[t]he curriculum is the same" and A.H. would "get the same supports" and "all of his related services, so nothing changes." *Id.* In March 2023, Plaintiff enrolled A.H. at Dunbar for the remainder of the second semester of his freshman year. *Id.* at 49. At Dunbar, A.H. was placed in a classroom that combined his Behavior Education Support Program with the Specific Learning Support program. *Id.* at 10. Plaintiff was not given prior written notice that Dunbar had combined the programs. *See id.*

In February 2024, in A.H.'s sophomore year at Dunbar, his IEP team revised his IEP. *Id.* at 8. A.H.'s 2024 IEP reduced his special education hours outside of the general education environment from 22 to 20 per week. *Id.* It also increased his behavior support service hours from two to four per month. *Id.* The 2024 IEP did not provide any extended school year services, nor did A.H. receive credit recovery classes. *Id.* A.H.'s most recent evaluations, made in his sophomore year, reflect that he remains well below grade level in every subject area. *Id.* at 9–10. While A.H.'s academic progress remains a substantial concern, a school-based social worker testified in the administrative hearing in September 2024 that she "saw progress in A.H. over time," including that he "became more insightful," began "using self-advocacy skills," and developed a "good rapport with [the] Public School Special Education Coordinator." *Id.* at 10–11. A.H. remains at Dunbar High School, from which he is on track to graduate in spring 2026. ECF No. 22-1 at 14.

### C.  Procedural History

On July 15, 2024, in the summer after A.H.'s sophomore year at Dunbar, Plaintiff filed a due process complaint. *Id.* at 4; *see also id.* at 28–60. Her complaint alleged that A.H. was denied a FAPE because: the District placed him in a combined Specific Learning Support and Behavior

Education Support classroom without providing Plaintiff prior written notice; the District reduced his special education hours from 22 to 20 in his 2023 IEP based on Dunbar's limited capabilities; his placement was inappropriate in 2022–23, 2023–24, and 2024–25 given his lack of academic progress; the District failed to update his behavior intervention plan in 2023 or thereafter; the District failed to provide extended school year services; the goals in his IEPs were inappropriate; he received insufficient hours of special education and behavioral support services; the District failed to conduct a comprehensive reevaluation in May 2022 or thereafter and to revise his IEPs based on that reevaluation; the District failed to provide Covid compensatory services; and the District failed to provide records requested by Plaintiff. *Id.* at 6–7.

For relief, Plaintiff requested, among other things, "an appropriate nonpublic placement" and "compensatory education," including "academic tutoring," "psychological counseling," and "mentoring." *Id.* at 7. Plaintiff's expert in special education opined that A.H. would "need a lot of compensatory education, tutoring, mentoring, [and] counseling to . . . put him in the place where he should have been if he'd been receiving appropriate services and if [the District] was meeting [its] obligations under IDEA to educate a student with a disability." *Id.* at 658–59. To place A.H. in the position he would have been in absent the alleged FAPE denials, Plaintiff's expert testified that A.H. required 2,500 hours of academic tutoring, 200 hours of psychological counseling, and 100 hours of mentoring. *Id.* at 12, 659.

Following a three-day due process hearing in September 2024, the hearing officer issued his decision on September 24, 2024, rejecting most, but not all, of Plaintiff's claims. *Id.* at 4–5. The hearing officer found the District denied A.H. a FAPE by including inappropriate goals in his IEPs, failing to perform a comprehensive reevaluation of A.H. by May 2022 and to revise his IEPs based on that reevaluation, and failing to provide Covid compensatory education services. *Id.* at

15–16, 18. The hearing officer rejected Plaintiffs claims that the District denied A.H. a FAPE by: not providing prior written notice to Plaintiff before combining the Behavior Education Support and Specific Learning Support programs at Dunbar, reducing the special education hours in A.H.'s 2024 IEP to match Dunbar's capacity, providing an IEP that allowed for an inappropriate placement, not updating his behavior intervention plan, not providing extended school year services in his 2023 and 2024 IEPs, not providing sufficient service hours in his IEPs, and not providing education records requested by Plaintiff. *Id.* 13–19.

Having found multiple FAPE denials, the hearing officer turned to remedy. He noted that compensatory education must be tailored to place a student in the "position [the] student would be in absent a FAPE denial." *Id.* at 19 (citation omitted). He explained that although "compensatory education is also necessary to make up for the denials of FAPE found above," a "significant adjustment was required [to the amount Plaintiff's expert opined was necessary] based on the fact that [Plaintiff] was successful on only certain claims." *Id.* at 19. Basing his decision "on [his] experience and careful analysis," the hearing officer "award[ed] 150 hours of 1:1 academic tutoring and 75 hours for either psychological counseling or mentoring (or divided between them) at [Plaintiff's] option." *Id.* Without identifying A.H.'s particular needs, the hearing officer stated that "[t]his determination . . . has been specifically tailored to address [A.H.'s] unique needs as a matter of equity." *Id.*

On December 23, 2024, Plaintiff filed a federal complaint seeking judicial review of the hearing officer's decision in this Court. ECF No. 1. In May 2025, this matter was then referred to the undersigned for full case management and report and recommendation. Minute Entry (May 2, 2025). On August 7, 2025, Plaintiff amended her complaint to replace her request for a non-public placement for A.H. with a request for tuition and fees for A.H. to attend a barber school and

an entrepreneurship program given A.H.'s impending graduation.  ECF Nos. 13, 13–4 at 27.  After

the District filed the administrative record, both parties moved for summary judgment on the ad-

ministrative record.  ECF Nos. 14, 20.  Both motions are now ripe for adjudication.[2]

## II.    LEGAL STANDARD

Although judicial review under the IDEA takes the form of cross motions for summary

judgment, it is not "a true summary judgment procedure."  *G.G. ex rel. Gersten v. District of Co-*

*lumbia*, 924 F. Supp. 2d 273, 277 (D.D.C. 2013) (quoting *L.R.L. ex rel. Lomax v. District of Co-*

*lumbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012)).  Where, as here, the parties do not present new

evidence, motions for summary judgment are treated as motions for judgment based on the admin-

istrative record.  *Id*. at 278; *accord N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57,

66 (D.D.C. 2010).  The party challenging the hearing officer's decision bears "the burden of per-

suading the court that the hearing officer was wrong."  *Reid ex rel. Reid v. District of Columbia*,

401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir.

1989).  Based on the administrative record, the court determines whether the hearing officer's

decision is supported by a "preponderance of the evidence" and may grant "such relief as the court

determines is appropriate."  *Id.* (citing 20 U.S.C. § 1415(i)(2)(B)).

The hearing officer's decision must be given "due weight."  *Bd. of Educ. of Hendrick*

*Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).  The court does not review the

---

[2] The District correctly notes that DCPS and OSSE—both named as Defendants in Plaintiff's complaint, *see* ECF No. 1 at 5—are *non sui juris*.  ECF No. 20 at 12.  "Courts in this District have held on numerous recent occasions that DCPS is *non sui juris*—that is, non-suable as an entity separate from the District of Columbia."  *Blue v. District of Columbia*, 850 F. Supp. 2d 16, 22 (D.D.C. 2012), *aff'd*, 811 F.3d 14 (D.C. Cir. 2015); *see also Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 521 F. Supp. 2d 22, 34 (D.D.C. 2007) (collecting cases holding that DCPS "is not a suable entity").  Similarly, "OSSE is *non sui juris* and therefore not subject to suit."  *A.D. v. Creative Minds Int'l Pub. Charter Sch.*, No. 18-cv-2430, 2020 WL 12654618, at *23 (D.D.C. Aug. 14, 2020), *report and recommendation adopted*, 2020 WL 6373329 (D.D.C. Sept. 28, 2020); *accord Brooks v. D.C. Off. of State Superintendent of Educ.*, No. 24-cv-1049, 2026 WL 734461, at *1 n.1 (D.D.C. Mar. 16, 2026).  Plaintiff does not contend otherwise.  Accordingly, the undersigned concludes that "Plaintiff's claims against DCPS [and OSSE] must be dismissed."  *Blue*, 850 F. Supp. 2d at 23.  Plaintiff's claims against the District of Columbia are properly asserted here and may proceed.  *See id.*

decision *de novo* and "by no means" may "substitute [its] own notions of sound educational policy for those of the school authorities." *Id.* The court's "deference is at its apex" on "matters of 'educational policy[]' or choices implicating 'agency expertise,' and at its nadir when the decision lacks thorough, reasoned findings or opines on a purely legal question." *Davis v. District of Columbia*, 244 F. Supp. 3d 27, 38 (D.D.C. 2017) (first quoting *Rowley*, 458 U.S. at 206; and then quoting *Kerkam*, 862 F.2d at 887). And where a decision is not based on reasoned findings, a "district court may determine that the 'appropriate' relief is a remand to the hearing officer for further proceedings." *Reid*, 401 F.3d at 526. Although "[j]udicial review under IDEA is more rigorous than in typical agency cases," *N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 18 (D.D.C. 2008) (citing *Reid*, 401 F.3d at 521), "the question is whether the IEP is *reasonable*, not whether the court regards it as ideal," *Endrew F.*, 580 U.S. at 399; *see also Rowley*, 458 U.S. at 206–07.

## III.    DISCUSSION

Plaintiff asserts many challenges to the hearing officer's decision. Those challenges can be sorted into three categories: procedural, substantive, and remedial.

Plaintiff raises two procedural issues. First, she contends that the District failed to provide her with prior written notice before combining the A.H.'s Behavior and Education Support program with the Specific Learning Support program at Dunbar. ECF No. 14-1 at 19. Second, she argues that the District reduced A.H.'s special education hours from 22 to 20 per week to align with Dunbar's ability to provide only 20 hours per week rather than his educational needs. *Id.* at 20–22.

Plaintiff next asserts three substantive violations of the IDEA. First, she claims that the District failed to recognize that A.H. required placement at a nonpublic school to receive a FAPE for school years 2022–23, 2023–24, and 2024–25. *Id.* at 13–15. Second, Plaintiff contends that A.H.'s 2023 and 2024 IEPs were inadequate because the District failed to update A.H.'s behavioral

intervention plan. *Id.* at 18–19. Third, Plaintiff asserts that A.H.'s 2023 and 2024 IEPs were inappropriate because they failed to include extended school year services to prevent regression over breaks in the school year. *Id.* at 16–18.

Plaintiff finally challenges the remedy provided for the multiple FAPE denials that the hearing officer did find. As Plaintiff explains, her "primary contention in this action" is that the hearing officer failed to provide compensatory education sufficient to place A.H. in the position he would have been in absent the FAPE denials. *Id.* at 1; *see also id.* at 8–13.

The undersigned addresses those challenges in turn. Finding a few of Plaintiff's challenges meritorious, the undersigned ultimately recommends that the Court remand this case to the hearing officer to conduct further proceedings.

### A.    Procedural Challenges

Courts have consistently recognized that "[a] procedural violation of the IDEA" does not "lead[] inexorably to a finding of a denial of a FAPE." *J.T. v. District of Columbia*, 496 F. Supp. 3d 190, 203 (D.D.C. 2020), *aff'd*, No. 20-7105, 2022 WL 126707 (D.C. Cir. Jan. 11, 2022). Instead, the D.C. Circuit has explained that a procedural violation is remediable only where it "affected the student's *substantive* rights." *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006). A plaintiff therefore must show that a procedural violation "compromise[d] the student's educational opportunities or seriously infringe[d] parents' participation in their child's education." *Cooper v. District of Columbia*, 77 F. Supp. 3d 32, 37 (D.D.C. 2014). With that harmless error-type rule in mind, the undersigned turns to Plaintiff's two procedural challenges.

#### 1.    *Failure to Provide Prior Written Notice of Change in Educational Placement*

The IDEA requires that a parent receive "written notice" before a school district changes the "educational placement of the child." 20 U.S.C. § 1415(b)(3). At the due process hearing,

Plaintiff argued that the District violated that requirement by failing to provide prior written notice when it combined A.H.'s Behavior and Education Support program with the Specific Learning Support program at Dunbar.  ECF No. 11-1 at 17.  The hearing officer recognized that Plaintiff did not receive prior written notice but concluded that A.H. was not denied a FAPE.  *Id.* at 17–18. Because the combination of the two programs did not change A.H.'s "educational placement" and thereby trigger the notice requirement, *see* 20 U.S.C. § 1415(b)(3), and because any violation was harmless in any event, the undersigned agrees.

The prior written notice requirement is implicated only when the school district changes the student's "educational placement."  20 U.S.C. § 1415(b)(3).  So, to succeed on her prior written notice claim, Plaintiff must show that the District changed A.H.'s "education placement," *id.*—that is, "the school district made a placement decision that triggered" the written notice requirement. *Wade v. District of Columbia*, No. 19-cv-2101, 2021 WL 3507866, at *7 (D.D.C. Feb. 11, 2021), *report and recommendation adopted*, 2022 WL 17485678 (D.D.C. Dec. 7, 2022).  The question therefore is whether the District changed A.H.'s educational placement.

Not every change to a student's educational program is a change to the student's "educational placement" that triggers the notice requirement.  "Although the IDEA does not define 'educational placement,'" *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 130 (D.D.C. 2018), the D.C. Circuit has indicated that a change in "educational placement" requires, "at minimum, a fundamental change in, or elimination of a basic element of the education program," *Lunceford v. District of Columbia Board of Educ.*, 745 F.2d 1577, 1582 (D.C. Cir. 1984).  Building on that guidance, this court has explained that "the term 'educational placement' in the IDEA can include both the physical location of educational services and the services required by the student's IEP." *J.T*, 496 F. Supp. 3d at 202 (citation modified) (quoting *Eley v. District of Columbia*, 47 F. Supp.

11

3d 1, 16–17 (D.D.C. 2014)).  On the other hand, courts have "avoided a construction of 'educational placement' that would require courts to micromanage" the more "minute aspects of a school district's curriculum choices."  *Eley*, 47 F. Supp. at 13.  Courts have thus found changes in "education placement" only where the new placement alters "the fundamental elements of the student's programming," *Middleton*, 312 F. Supp. 3d at 131, or is "substantially and materially different" from the prior placement, *Aikens v. District of Columbia*, 950 F. Supp. 2d 186, 192 (D.D.C. 2013).

Fundamental alterations to the *educational environment* can be a change in educational placement.  In *Eley*, for instance, the court found a "change in educational placement" where the student was "shift[ed] from . . . a completely individualized instructional setting separate from other students to a more traditional school setting."  47 F. Supp. 3d at 18.  The student's initial placement was "an internet school with no campus or physical classroom and no access to other peers in the educational setting."  *Id.* (citation modified).  The placement the student was moved to, by contrast, was a "specialized" brick-and-mortar "school for students with learning disabilities that offer[ed] a small-group setting" and "one-in-one instruction . . . led by a certified teacher and a teaching assistant with a reading specialist."  *Id.* (citation modified).  The court concluded that it was "clear" that a move to such a starkly different educational environment was "a change in educational placement."  *Id.*

Substantial alterations to the *content* of the educational programming can also be a change in educational placement.  For example, in *Middleton*, the court found a change in educational placement when the school district elevated the student to "the standard high school diploma track" from the "Certificate of IEP Completion" track.  312 F. Supp. 3d at 129–130.  That was because changing the student's track changed the "academic requirements" the student needed to meet to complete the program and "shaped the courses selected for [the] student during [the student's] high

school career." *Id.* at 131. Accordingly, the court concluded that changing the student's track constituted a change in education placement because it "effectively determine[d] major aspects" and "shape[d] fundamental elements of the student's programming." *Id.* at 131–32.

Most fundamentally, education placement determinations require a substance-over-form analysis. *See J.T*, 496 F. Supp. 3d at 202. That point is well-illustrated by *Aikens*. There, the court concluded that integrating the previously separate "Transition Academy at Shadd" into Ballou Senior High School under the name "Ballou Arts and Technology Academy" ("BAT") was not a change in educational placement of a Transition Academy student. 950 F. Supp. 2d at 188 & n.2. Although the student was educated in a new location in a program with a different name, the court found that she "continued to experience the same general educational program at BAT as she experienced at Shadd—specialized instruction outside of the general educational setting by certified teachers with a support staff of social workers, behavioral technicians, and a school psychologist." *Id.* at 192. The court accordingly found that there was no "'fundamental change in' or 'elimination of' a basic element of [the] educational program at Shadd when it moved to BAT." *Id.*

Here, Plaintiff has not shown that combining A.H.'s Behavior and Education Support program with the Specific Learning Support program was a change in A.H.'s "educational placement." 20 U.S.C. § 1415(b)(3). As the hearing officer correctly recognized, making that determination requires "a nuanced understanding" and comparison of the two programs. ECF No. 11-1 at 17. And as explained below, although nominally distinct programs, each provided "the same general educational program," *Aikens*, 950 F. Supp. 2d at 192—the same educational content, the same support services, and the same educational environment.

To begin, the content of A.H.'s educational program remained the same. As the evidence introduced at the due process hearing showed, "the curriculum is the same in both programs." ECF

13

No. 11-1 at 853.  Each provides specialized education outside of the general education environment as well as access to the "gen[eral] ed[ucation] curriculum." *Id.*  And each program places students "on [the high school] diploma track." *Id.* at 895.  The curriculum and "academic requirements," *Middleton*, 312 F. Supp. 3d at 131, of the two programs are therefore not "substantially and materially different," *Aikens*, 950 F. Supp. 2d at 192.

So, too, are the support services provided by each program.  As the program manager for Behavior Education Support and Specific Learning Support in the District testified, the combination of the two programs did not "change any of the strategies or support . . . provided to the students" because "[t]he interventions are similar in both classrooms."  ECF No. 11-1 at 853.  And when the two programs merged, the District "put all [the Behavior Education Support program] supports in that classroom." *Id.* at 990.  Thus, the support services provided to A.H. did not change when the programs combined.  *See Aikens*, 950 F. Supp. 2d at 192.

Finally, the learning environment is the same in each program.  Each program provides a self-contained classroom with small class sizes to support students who "may be overstimulated in a large setting." *Id.* at 851; *see also id.* at 308–09, 729-30, 856.  Both programs, moreover, existed separately within Dunbar and continue to operate as one within Dunbar.  *See* ECF No. 11-1 at 895.  So A.H.'s "placement at a specific physical school" is the same after the combination of the programs.  *See J.T.*, 496 F. Supp. 3d at 202.  Accordingly, the environment in which A.H. received instruction is not "substantially and materially different." *See Aikens*, 950 F. Supp. 2d at 192; *see also Eley*, 47 F. Supp. 3d at 18.

In sum, on this record, the combination of A.H.'s Behavior Education Support program with the Specific Learning Support program is closer to the substantively similar yet relocated and renamed program in *Aikens* than the starkly divergent programs of *Eley* or *Middleton*.  Nor does

14

Plaintiff point to any evidence that would undercut that conclusion.  The hearing officer therefore correctly found that "both classrooms were self-contained, diploma track programs and the curriculum was the same."  *Id.* at 17.  Combining the two programs did not alter "the fundamental elements of the student's programming," *Middleton*, 312 F. Supp. 3d at 131, nor was it "substantially and materially different" from the prior placement, *Aikens*, 950 F. Supp. 2d at 192.  Accordingly, the District did not change A.H.'s "educational placement," so the District's failure to provide prior written notice did not violate the IDEA because prior written notice was not required.  *See* 20 U.S.C. § 1415(b)(3).[3]

Even if prior written notice was required, however, the District's failure to provide it was harmless.  Recall that a procedural violation is remediable only where it "affected the student's *substantive* rights."  *Lesesne*, 447 F.3d at 834.  In *J.T.*, for instance, the court found that the school district's failure to "hold a meeting . . . that included the parents and a representative of the school" before placing the student at the school did not deny the student a FAPE.  496 F. Supp. 3d at 200.  The court explained that the parent "had substantial opportunity to participate—and did participate—in the" development of the IEP used to determine the student's placement.  *Id.* at 203.  And the parent learned information sufficient to participate in that process by other means, namely "in the form of her visits" to the school where the student was ultimately placed.  *Id.* at 204.  Accordingly, the court concluded that the district's "failure to convene the meeting required [by the IDEA] was not a sufficiently serious deprivation of Plaintiff's participation rights under the IDEA to constitute a denial of a FAPE."  *Id.* at 205 (internal citation omitted) (citing *Lesesne*, 447 F.3d at 834).

---

[3] Plaintiff contends that the District's "claim that it merged [the two] programs, instead of switching A.H. to its [Specific Learning Support] program" was made for the first time at the due process hearing.  ECF No. 22-1 at 20.  Given the similarities of the two programs described above, there would seem to be little more than a semantic difference between those two claims.  Regardless, but for the same reason, it makes no difference in the analysis—either way, "the fundamental elements of the student's programming" did not change whether A.H. was moved to the Specific Learning Support program or the programs were combined.  *See Middleton*, 312 F. Supp. 3d at 131.

So too here.  To start, the similarity of the two programs counsels against finding that the failure to notify Plaintiff of the change "affected the student's *substantive* rights," *Lesesne*, 447 F.3d at 834, for the simple reason that the change had very little, if any, actual effect on the services received by the A.H.  As explained above, the record suggests that very little changed from A.H.'s perspective when he was placed in a combined classroom.  Certainly, Plaintiff points to no service that A.H. no longer received as a result of the change.

The record similarly supports the hearing officer's conclusion that Plaintiff meaningfully participated in determining A.H.'s placement.  *See* ECF No. 11-1 at 10.  The program manager for Behavior Education Support and Special Learning Support testified that she communicated with Plaintiff over text about A.H. moving from Ron Brown to a school that could provide a self-contained program before A.H. was placed at Dunbar.  *Id.* at 849–50, 857–58.  In these conversations, Plaintiff was provided with a number of options of different public high schools that could support A.H.'s IEP, including Dunbar.  *Id.* 856–57.  These conversations took place over the course of several months before A.H. was enrolled at Dunbar.  *Id.* 860–61.  And Plaintiff was the one who ultimately decided, after these conversations, to enroll A.H. at Dunbar.  *Id.* at 49.

Through those conversations, Plaintiff was provided information about the Behavior Education Support and Specific Learning Support programs.  Early on in the conversations between Plaintiff and the program manager, the program manager explained to Plaintiff that Dunbar "could support [A.H.] in a[] [Specific Learning Support] classroom."  *Id.* at 857.  Plaintiff was informed that "[t]he curriculum is the same" between it and the Behavior Education Support program.  *Id.* And Plaintiff was informed that A.H. would "get the same supports" and "all of his related services" in the Specific Learning Support program, "so nothing changes."  *Id.*  As noted above, this conversation took place before A.H. began attending Dunbar, meaning that Plaintiff knew both

programs at Dunbar would provide essentially the same experience for A.H. when Plaintiff enrolled A.H. at Dunbar. In other words, Plaintiff was aware of the substance of the educational programming A.H. would receive when she agreed to place A.H. at Dunbar, even if she was not aware that it would be in a combined program.

Although it is not clear from the record whether Plaintiff was ever expressly informed that Dunbar had, in fact, combined the two programs, the record does support the conclusion that any violation of Plaintiff's right to receive that notice was not a "sufficiently serious deprivation of Plaintiff's participation rights under the IDEA to constitute a denial of a FAPE." *See J.T.*, 496 F. Supp. 3d at 205 (citing *Lesesne*, 447 F.3d at 834). Much like in *J.T.*, Plaintiff "had substantial opportunity to participate," 496 F. Supp. 3d at 203—indeed, Plaintiff ultimately made the decision to enroll A.H. at Dunbar, ECF No. 11-1 at 591—and received sufficient information about the substance of the educational programming A.H. would receive at Dunbar to participate meaningfully when making that decision. *See J.T.*, 496 F. Supp. 3d at 203–204. Accordingly, any failure to provide prior written notice of the change was harmless.

Plaintiff responds that the hearing officer's finding, based on testimony of the program manager at the hearing, that she "spoke to [Plaintiff] about changing [A.H.'s] educational placement prior to doing so is not supported by the evidence of record and actually contradicts the only documentary evidence." ECF No. 22-1 at 20. As explained above, the program manager testified that she communicated with Plaintiff about the educational programming at Dunbar. Moreover, a "hearing officer's findings 'based on credibility determinations of live witness testimony' are given 'particular deference'" when not contradicted by "extrinsic evidence." *W.S. v. District of Columbia*, 502 F. Supp. 3d 102, 119 (D.D.C. 2020) (quoting *McAllister v. District of Columbia*, 45 F. Supp. 3d 72, 76–77 (D.D.C. 2014)). And the single piece of extrinsic evidence on which Plaintiff

now relies—a note in A.H.'s IEP journal indicating that the District changed A.H.'s "schedule to [Specific Learning Support] per request from Ms. McMillan and Ms. Kurude," ECF No. 11-1 at 392; *see* ECF No. 22-1 at 20—says nothing that contradicts the program manager's testimony that Plaintiff was informed about the similarities of both programs, or the hearing officer's conclusion that Plaintiff received sufficient information to participate in the placement decision.  Plaintiff's attack on the hearing officer's finding therefore fails.

For those reasons, the undersigned concludes that the hearing officer's finding that A.H. was not denied a FAPE by the District's failure to provide prior written notice should be affirmed.

### 2.  *Predetermination*

Plaintiff next argues that the District improperly reduced A.H.'s special education hours in his 2024 IEP.  ECF No. 14-1 at 20.  As she notes, A.H.'s 2022 and 2023 IEPs provided him with 22 hours per week of special education.  *Id.*  But A.H.'s 2024 IEP reduced his special education hours to 20 hours per week.  *Id.*  That reduction occurred in the first IEP developed for A.H. after he began attending Dunbar (i.e., in his 2024 IEP).  *See* ECF No. 11-1 at 8.  Plaintiff contends—and the District nowhere disputes—that "the maximum number of hours of specialized instruction" Dunbar could provide was "20 hours per week," ECF No. 14-1 at 21.  Thus, Plaintiff claims that the District reduced A.H.'s special education hours "so that A.H. could attend" Dunbar rather than to fit his individual needs.  *Id.*  As explained below, this constitutes a procedural violation of the IDEA, and the undersigned concludes that any violation did not deny A.H. a FAPE.

At the outset, the undersigned notes that the hearing officer's reasoning on this front leaves much to be desired.  Without acknowledging the thrust of Plaintiff's argument, the hearing officer rejected Plaintiff's claim because "the move to a higher level school, with a change from specials to electives and a significant increase in related services for student [referring to the additional two hours per month of behavior support services in his 2024 IEP], did quite reasonably bring a small

shift in the hours needed for the self-contained classroom from 22 hours/week to 20 hours/week, with both providing a full-time IEP." ECF No. 11-1 at 18–19. While "the move to a higher level school" and the "change from specials to electives" may explain *why Dunbar* offered only 20 hours of special education, they do not explain why A.H.'s IEP is "'*specially* designed' to meet [his] '*unique* needs' through an '*individualized* education program.'" *Endrew F.*, 580 U.S. at 400 (citation modified). And even assuming the two hour per month increase in behavior support services could offset the reduction of eight hours per month in his special education hours, A.H. still received six fewer total hours per month of services. Neither the District nor the hearing officer identifies any change in A.H.'s needs that would explain that reduction.

Regardless, the undersigned agrees with the hearing officer's ultimate conclusion that the reduction was not substantial enough to deny A.H. a FAPE. Plaintiff makes what is often referred to as a "'shoehorning' or 'predetermination'" claim—interchangeable terms for the same thing. *See Shipley v. District of Columbia*, No. 18-cv-2550, 2020 WL 13669941, at *8 (D.D.C. Mar. 6, 2020), *report and recommendation adopted in part*, 2020 WL 13669870 (D.D.C. Mar. 24, 2020). That is, Plaintiff claims that the District designed A.H.'s IEP based on what Dunbar could provide rather than "tailor[ing]" it to A.H.'s "reasonably known needs." *Z.B. v. District of Columbia*, 888 F.3d 515, 523 (D.C. Cir. 2018). In so doing, Plaintiff claims the District "shoehorned" A.H. into Dunbar and "predetermined" his IEP by deciding in advance that it must align with Dunbar's capabilities. Such claims are considered "procedural in nature," meaning that the IDEA's harmless error rule applies. *Shipley*, 2020 WL 13669941, at *8.

That may seem counterintuitive. To better understand that conclusion, it is helpful to compare "shoehorning" claims with other IDEA claims: the "substantive IEP challenge" and the procedural "failure-to-implement" challenge. *See Sinclar ex rel. O.S. v. District of Columbia*, No. 19-

19

cv-434, 2020 WL 13442909, at \*12 (D.D.C. Aug. 28, 2020).  In a substantive IEP challenge, the plaintiff challenges the IEP on the grounds that it is not "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 580 U.S. at 399.  In other words, the claim directly asserts that the student did not receive a FAPE.  *See id.*  In a "failure-to-implement" claim, though, the plaintiff argues that the school district "failed to implement" provisions of the IEP rather than that the IEP itself fails to provide a FAPE.  *Beckwith v. District Columbia*, 208 F. Supp. 3d 34, 49 (D.D.C. 2016) (quoting *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000)).  Because that claim does not itself encompass the denial of a FAPE, it remains possible that the student "received (or was offered) a FAPE in spite of a technical violation of the IDEA."  *Shelton v. Maya Angelou Pub. Charter Sch.*, 578 F. Supp. 2d 83, 103 (D.D.C. 2008) (quoting *M.M. ex rel. D.M. v. Sch. Dist.*, 303 F.3d 523, 534 (4th Cir. 2002)).  To demonstrate a denial of FAPE, courts have accordingly required the plaintiff to show that the school district "failed to implement *substantial* or *significant* provisions of the IEP," usually by examining "the proportion of services mandated to those actually provided."  *Beckwith*, 208 F. Supp. 3d at 49 (emphasis added) (first quoting *Bobby R.*, 200 F.3d at 349; and then quoting *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 275 (D.D.C. 2011)).

Compare those claims to the "shoehorning" claim.  A shoehorning claim is similar to a procedural failure-to-implement claim, the difference being only that the school district changes the student's IEP in the former while the school district simply fails to heed the IEP in the latter.  As noted above, a "shoehorning" claim asserts that the school district adjusted the student's IEP to fit what the predetermined placement school could provide rather than what would meet the student's needs.  That is a problem under the IDEA for two related reasons: one, it introduces an improper consideration into the decisionmaking process beyond the student's "particular needs,"

*Z.B.*, 888 F.3d at 524, and two, a predetermined outcome devalues "parental participation in the IEP process," *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004).  But neither of those errors *necessarily* means that the student was denied a FAPE.  *See Shelton*, 578 F. Supp. 2d at 103.  In other words, Plaintiff challenges the decisionmaking *process*, and an improper decisionmaking process may still result in an IEP that is sufficient to provide the student a FAPE.  *See Beckwith*, 208 F. Supp. 3d at 49.  A shoehorning claim thus requires the plaintiff to show *both* that the school engaged in shoehorning *and* that the "violation[] affected the student's *substantive rights*." *Dixon v. District of Columbia*, 83 F. Supp. 3d 223, 231 (D.D.C. 2015) (quoting *Lesesne*, 447 F.3d at 834).

Accordingly, courts have found that "*de minimis*" changes to a student's IEP to accommodate what the school can provide constitute harmless error.  *See, e.g.*, *Shipley*,  2020 WL 13669941, at *15.  A *de minimis* change to an IEP is one that does not cause "a violation of [the student's] substantive educational rights."  *Dixon*, 83 F. Supp. 3d at 231.  Much like with the failure-to-implement claim, courts generally "have focused on the proportion of services" actually offered to the services necessary to provide a FAPE.  *Beckwith*, 208 F. Supp 3d at 49 (quoting *Wilson*, 770 F. Supp. 2d at 275).  Where the allegation is that the school district reduced the services offered from one IEP to the next, courts sensibly compare the services provided in the IEPs to determine whether there was a "material" or "substantial" reduction.  *Shipley*, 2020 WL 13669941, at *15; *see Dixon*, 83 F. Supp. 3d at 231; *Johnson v. District of Columbia*, 962 F. Supp. 2d 263, 269 (D.D.C. 2013) (comparing IEPs in the context of a failure-to-implement claim).  Thus, "[c]ourts in this Circuit have recognized that where the difference in instructional time is not 'material' or 'substantial,' a FAPE has not been denied."  *Shipley*, 2020 WL 13669941, at *15; *see also Savoy v. District of Columbia*, 844 F. Supp. 2d 23, 34 (D.D.C. 2012) (same in failure-to-implement claim).

To the extent that a line demarcating the *de minimis*-material divide exists, no court in this Circuit has clearly drawn it. Instead, courts have proceeded by sorting *de minimis* from material reductions on a case-by-case basis. In *Shipley*, the court concluded that the student's "depriv[ation] of two hours per week of specialized instruction" was "*de minimis*" and therefore "unactionable." 2020 WL 13669941, at *15. Similarly, in *Savoy*, addressing a failure-to-implement claim, the court found that "a 3%, or ten minute per day"—"less than one hour per week"—"deviation [wa]s not a material to [the student's] IEP." 844 F. Supp. 3d at 34. And in *Johnson*, also a failure-to-implement case, the court sanctioned an 11% reduction, determining that "the difference between thirty-one and a little over twenty-eight [hours per week of specialized instruction] does not constitute a material deviation from the requirements of the IEP." 962 F. Supp. 2d at 269. By contrast, in *Wade v. District of Columbia*, the court found that a 7.5-hour per week deficit denied the student a FAPE because the "failure to implement 7.5 hours out of [the student's] 27.5-hour IEP was not a *de minimis* failure." 322 F. Supp. 3d 123, 134 (D.D.C. 2018). Likewise, in *Middleton*, the court found a denial of a FAPE where "either 40% (if World History is included) or 20% (if World History is excluded) of [the student's] instruction was not performed in conformity with [the student's] IEP." 312 F. Supp. 3d 145.

Nor does this case require locating the line between *de minimis* and material reductions to conclude that any violation falls comfortably on the *de minimis* side. A.H.'s special education hours were reduced from 22 per week to 20 per week, meaning he was deprived of two hours per week of specialized instruction. *See* ECF No. 14-1 at 20; ECF No. 20 at 22. *Shipley* found that a "depriv[ation] of two hours per week of specialized instruction . . . would be *de minimis*." 2020 WL 13669941, at *15. As the court explained, the loss of "two hours per week . . . is within the same zone of unactionable harms recognized by other district courts." *Id.* And the shift from 22

22

to 20 hours per week equates to an approximately 10% reduction. *Johnson* found that an 11% reduction in special education hours was harmless. 962 F. Supp. 2d at 269. Accordingly, even assuming that the District violated the IDEA by shoehorning A.H., that violation was harmless.

Plaintiff points out that "A.H.'s reading skills had regressed from 7 years below grade level in 2021/22, to 8 years below grade level in 2022/23, and then to 7 to 9 years below grade level in 2023/24." ECF No. 14-1 at 22. But as even Plaintiff acknowledges, A.H.'s lack of attainment, including the formal evaluations on which she relies, predate the District's reduction of his special education hours in the spring of 2024. ECF No. 11-1 at 8; *see* ECF No. 14-1 at 22. Put differently, that lack of attainment existed when A.H.'s IEP provided 22 hours per week of specialized instruction and Plaintiff points to nothing that would suggest it was exacerbated after his IEP was changed in the spring of 2024. Thus, while it is evident that A.H. struggled academically, there is no evidence that A.H.'s lack of attainment resulted from the violation.

Plaintiff also invokes *Wade*'s statement that "[I]f [the DCPS High School] cannot provide more than 20 hours of special education outside a general education setting . . . DCPS cannot place students at [the DCPS High School] who have such needs." ECF No. 14-1 at 21 (alterations in original) (quoting *Wade*, 322 F. Supp. 3d at 132). But the quotation from *Wade* related to the Plaintiff's challenge to the student's educational placement at a school that could not implement his IEP, not a shoehorning or failure-to-implement claim subject to the harmless error rule. *See* 322 F. Supp. 3d at 131–32; *see also* Section III.B.1, *infra* (discussing inappropriate placement claims). Addressing the separate failure-to-implement claim in *Wade*, the court explained that "the failure to implement 27%" of the student's required special education hours, or "7.5 hours out of [the student's] 27.5-hour IEP[,] was not a *de minimis* failure." *Wade*, 322 F. Supp. 3d at 133–34.

23

As explained above, however, courts in this Circuit have found lesser reductions, like the two hours here, fall on the other side of the *de minimis*-material line.

Accordingly, the undersigned concludes that even assuming that the District improperly shoehorned A.H. by reducing his special education hours, A.H. was not denied a FAPE.

**B.        Substantive Challenges**

Plaintiff next challenges the hearing officer's rejection of three of her substantive FAPE claims.  For the following reasons, the undersigned concludes that only Plaintiff's challenge to the hearing officer's decision regarding A.H.'s extended school year services has merit.

1.        *Inappropriate Placement*

Plaintiff first raises an overarching objection to A.H.'s IEPs for the 2022–23, 2023–24, and 2024–2025 school years, which she refers to as "her inappropriate placement claim."  ECF No. 14-1 at 13.  Rather than objecting to any component of A.H.'s IEPs, she argues his placement in the Behavior Education Support program in a public high school "was inappropriate for [A.H.] . . . because he had made no progress and actually suffered regression after 3 years in [the Behavior Education Support] program for middle school."  *Id.* at 14–15.  She claims that A.H. required a more restrictive "nonpublic placement" to receive a FAPE.  *Id.* at 14.  Because Plaintiff fails to identify a flaw in the design of A.H.'s IEP warranting a more restrictive placement beyond A.H.'s lack of progress, the undersigned concludes that A.H. was not denied a FAPE.

As an initial matter, it is important to understand the nature of Plaintiff's claim.  Doing so requires disentangling similar but distinct claims under the IDEA.  To provide a FAPE, a "school district must provide the student with both an appropriate IEP *and* an appropriate school placement."  *District of Columbia v. Bryant-James*, 675 F. Supp. 2d 115, 119 (D.D.C. 2009) (emphasis added) (citing 20 U.S.C. § 1401(9)).  An appropriate IEP is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 580 U.S. 399.

24

An appropriate placement can "fulfill the requirements set forth in the student's IEP." *J.T.*, 496 F. Supp. 3d at 207 (quoting *Middleton*, 312 F. Supp. 3d at 143). A school district's failure to meet either of those requirements violates the IDEA. But the resulting violations give rise to distinct legal claims—that the *IEP itself* was inappropriate because it failed to meet the student's needs or that the *placement* was inappropriate because it was incapable of implementing the IEP.

Plaintiff contends that the District denied A.H. a FAPE by failing to place A.H. at "an appropriate non-public placement." ECF No. 14-1 at 13. Although Plaintiff frames her challenge as one to A.H.'s placement, she does not claim that Dunbar could not "fulfill the requirements set forth in the student's IEP." *J.T.*, 496 F. Supp. 3d at 207 (quoting *Middleton*, 312 F. Supp. 3d at 143). Rather, she asserts that a more restrictive placement was required to provide a FAPE. ECF No. 14-1 at 13. Her true target thus is not A.H.'s placement *per se* but A.H.'s IEP insofar as it required a less restrictive placement. *See J.T.*, 496 F. Supp. 3d at 207. Put differently, she argues that A.H. needed a different IEP that called for a more restrictive placement to receive a FAPE, not that A.H. needed a different placement to implement his existing IEP. *See N.T. v. District of Columbia*, No. 23-cv-370, 2025 WL 1895485, at *6 (D.D.C. July 9, 2025) (explaining this distinction), *report and recommendation adopted*, 2025 WL 2635655 (D.D.C. Sep. 12, 2025). Accordingly, her claim is really that A.H.'s IEPs were inappropriate.[4]

The hearing officer appeared to conflate these distinct claims. He noted that "[t]he IDEA requires 'school districts to offer placement in a school and in programming that can fulfill the

---

[4] The substance of Plaintiff's claim must also be distinguished from the remedy she requests. Plaintiff at times conflates her substantive claim—that A.H. was denied a FAPE for school years 2022-23, 2023-24, and 2025-26—with the non-public placement remedy she sought. *See* ECF No. 14-1 at 14. As the D.C. Circuit has explained, "an award of private-school placement is not, like [a] tutoring award, retrospective relief designed to compensate for *yesterday's* IDEA violations, but rather prospective relief aimed at ensuring that the child receives *tomorrow* the education required by IDEA." *Branham v. District of Columbia*, 427 F.3d 7, 11 (D.C. Cir. 2005). Accordingly, the question here on her substantive claim is whether a nonpublic placement was required to provide A.H. a FAPE in the 2022-23, 2023-24, and 2024-25 school years, not whether he requires a nonpublic placement going forward.

requirements set forth in the student's IEP.'" ECF No. 11-1 at 14 (quoting *Middleton*, 312 F. Supp. 3d. at 143)). And he concluded that "there was an insufficient assertion that DCPS could not fulfill [A.H.'s] IEPs at" Dunbar. *Id.* This error could be forgiven due to the lack of clarity with which Plaintiff frames her claim. *See, e.g.*, *id.* at 55. But the statement of the issue in the hearing officer's decision asked "[w]hether DCPS denied [A.H.] a FAPE by failing to provide an appropriate place-ment/location of services . . . because the same program was wholly inappropriate for middle school." *Id.* at 13. And the hearing officer noted that Plaintiff's "theory of the case is that the [Behavior Education Support] program was not helpful for [A.H.]" *Id.* at 14. That drives at the *substance* of A.H.'s IEP, not Dunbar's ability to implement it. The hearing officer therefore should have recognized that Plaintiff alleged that A.H.'s IEPs were inappropriate and evaluated whether they were "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. 399.[5]

Even under the correct standard, however, the undersigned agrees with the hearing officer's ultimate conclusion that A.H. was not denied a FAPE. To recap, Plaintiff claims that A.H.'s IEPs were inappropriate insofar as they allowed his placement in the Behavioral Education Support program in public school. To prevail on that claim, Plaintiff bears "the burden of persuading the court" that A.H.'s IEPs were inappropriate based on "the preponderance of the evidence." *Reid*, 401 F.3d at 521 (quoting 20 U.S.C. § 1415(i)(2)(B)(iii)).

An IEP is appropriate if it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. 399. Making that

---

[5] The District appears tacitly to concede that the hearing officer applied the wrong legal standard. The District does not defend the hearing officer's conclusion that "there was an insufficient assertion that DCPS could not fulfill [A.H.'s] IEPs at" Dunbar. ECF No. 11-1 at 14. Instead, the District acknowledges Plaintiff's claim is that A.H.'s "self-con-tained classroom placements in his 2022, 2023, and 2024 IEPs were inappropriate." ECF No. 20 at 16. And the District joins that issue, arguing that A.H.'s IEPs were "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 12–16 (quoting *Z.B.*, 888 F.3d at 519).

26

determination requires "evaluat[ing] IEPs' substantive adequacy 'as of the time each IEP was created rather than with the benefit of hindsight.'" *Edward M.R. v. District of Columbia*, 128 F.4th 290, 294 (D.C. Cir. 2025) (quoting *Z.B.*, 888 F.3d at 524). At the end of the day, though, "Congress has not committed to educational perfection." *Z.B.*, 888 F.3d at 528. Accordingly, "the question is whether the IEP is *reasonable,* not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399.

Along similar lines, "a child's 'educational outcome' isn't the measure of his IEP's sufficiency." *Edward M.R.*, 128 F.4th at 294. That is because the IDEA "does not promise 'any particular educational outcome'" or "guarantee any particular level of education." *Endrew F.*, 580 U.S. at 398 (citation modified) (quoting *Rowley*, 458 U.S. at 192). The D.C. Circuit has thus rejected evidence that a student "failed to make meaningful progress on some goals" as proof of a denial of a FAPE. *Edward M.R.*, 128 F.4th at 293. Since "the proper measure" of an IEP's appropriateness "is the reasonableness of [the] IEP's design," a plaintiff "must identify a flaw in the design of an IEP." *Id.* at 294. And even where a "lack of progress" may be "some evidence that [a student's] IEPs were not reasonably designed from the get-go, that evidence is not enough." *Id.* Accordingly, although an "IEP must *aim* to enable the child to make progress," the unfortunate fact that such progress never came to pass does not invalidate an otherwise appropriate IEP. *See Endrew F.*, 580 at 399 (emphasis added); *see also J.B. ex rel. Belt v. District of Columbia*, 325 F. Supp. 3d 1, 9 (D.D.C. 2018) ("[L]imited academic progress does not *ipso facto* signal a violation of the IDEA.").

The IEP, moreover, must provide the student with the "least restrictive environment" possible. 20 U.S.C. § 1412(a)(5). The "IDEA requires that disabled children be educated 'to the maximum extent appropriate with children who are not disabled.'" *A.D. ex rel. E.D. v. District of*

27

*Columbia*, No. 20-cv-2765, 2022 WL 683570, at *8 (D.D.C. Mar. 8, 2022) (citation modified) (quoting 20 U.S.C. § 1412(a)(5)(A)).  Students therefore may not be removed from "the regular educational environment" unless "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Z.B.*, 888 F.3d at 528 (quoting 20 U.S.C. § 1412(a)(5)(A)).  That means that "children with disabilities receive education in the regular classroom 'whenever possible.'" *Endrew F.*, 580 U.S. at 400 (quoting *Rowley*, 458 U.S. at 202).  In this way, the IDEA presumes that a student will reap educational benefits from appropriate education among, and interaction with, nondisabled peers.

Those two principles are sufficient to resolve Plaintiff's claim.  Plaintiff relies entirely on A.H.'s lack of progress to support her claim that his high school IEPs were inappropriate.  As Plaintiff herself notes, at the due process hearing she "repeatedly asserted from the very beginning all the way through to the end of the hearing that [A.H.] required a non-public placement to immediately begin making progress before the end of his high school years."  ECF No. 14-1 at 14; *see also id.* at 15 (noting "the plethora of evidence in this case proving that [A.H.] made no progress academically or behaviorally in the [Behavior Education Support] middle school program, and also made no academic progress in the [Behavior Education Support] high school program").  But the D.C. Circuit has held that, absent "a flaw in the design" of the IEP, a student's "lack of progress" is "not enough" to show that the IEPs were inappropriate.  *Edward M.R.*, 128 F.4th at 294.  And Plaintiff nowhere "identif[ies] a flaw in the design of [A.H.'s] IEP[s]."  *See id.*  She instead challenges the broader failure to provide for a more restrictive environment.  Without more, Plaintiff's argument runs headlong into not only the D.C. Circuit's requirement that she "identify

28

a flaw in the design" of A.H.'s IEPs, *id.*, but also into the IDEA's "imperative" that students be educated in the least restrictive environment possible, *see Z.B.*, 888 F.3d at 528.[6]

In any event, the record discloses that A.H. has made some progress. For instance, A.H.'s reading score increased from 415 at the beginning of the 2022-23 school year to 525 at the middle of the 2023-2024 school year, the last reading evaluation on record, and peaked at 562 at the beginning of the 2023-24 school year. ECF No. 11-1 at 10. A.H.'s math score similarly improved from 415 at the beginning of the 2022-23 school year to 512 in the middle of the year, "improving from 7 years below grade level to 2 years below grade" level. *Id.* at 9. These improvements should not be overstated—even A.H.'s highest reading score was still "7 to 9 years below grade level." *Id.* at 10. But they should not be gainsaid, either. The IDEA contemplates that "the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between." *Endrew F.*, 580 U.S. at 400. That is one reason why "a child's 'educational outcome' isn't the measure of his IEP's sufficiency." *Edward M.R.*, 128 F.4th at 294 (quoting *Endrew F.*, 580 U.S. at 398). Accordingly, A.H.'s sporadic

---

[6] Plaintiff notes that some courts have observed that "[a]cademic progress under a prior plan may be relevant in determining the appropriateness of a challenged IEP." ECF No. 22-1 at 9 (quoting *K.P. v. District of Columbia*, 962 F. Supp. 2d 216, 221 (D.D.C. 2013)). Although the cases on which Plaintiff relies predate both *Endrew F.* and *Edward M.R.*, they are not necessarily inconsistent. As the court explained in *Edward M.R.*, a "lack of progress" may be "some evidence" of a "flaw in the design of an IEP." 128 F.4th at 294. In that way, progress may be "relevant." *K.P.*, 962 F. Supp. 2d at 221. Still, a "lack of progress" on its own, detached from any "flaw of the design of an IEP," is "not enough." *Edward M.R.*, 128 F.4th at 294. For the same reason, to the extent that Plaintiff argues that A.H.'s IEPs at some point became inappropriate given his lack of progress in the years prior to their adoption, the undersigned is unpersuaded. Because "the IDEA cannot and does not promise 'any particular educational outcome,'" school districts are not required to progressively ratchet up the restrictiveness of an IEP year-after-year solely because a student's progress does not match that of their nondisabled peers. *Endrew F.*, 580 U.S. at 398 (citation modified); *see J.B.*, 325 F. Supp. 3d at 4, 9 (holding that the student's lack of progress from 2014 to 2017 was insufficient to show that the student's 2016 and 2017 IEPs were inappropriate); *see also Jackson v. District of Columbia*, No. 19-cv-197, 2020 WL 3318034, at *13–14 (D.D.C. June 2, 2020) (similar), *report & recommendation adopted*, 2020 WL 3298538 (D.D.C. June 18, 2020). Instead, districts must provide appropriately designed IEPs, and a plaintiff challenging the IEP must connect the dots between the IEP's design and the student's lack of progress. *See Edward M.R.*, 128 F.4th at 294. Plaintiff has not carried that burden.

and limited progress does not show that he was denied the educational benefits to which he was entitled.

The record also reflects A.H.'s progress in areas less amenable to quantification. As the hearing officer noted, a school-based social worker testified that she "saw progress in A.H. over time." ECF No. 11-1 at 11. He "became more insightful" during his time at Dunbar. *Id.* He began "using self-advocacy skills," too. *Id.* He developed a "good rapport with [the] Public School Special Education Coordinator." *Id.* at 10–11. And he "was eager . . . to be with [his] general education peers." *Id.* at 11. The benefits A.H. received from interactions with faculty and peers in "the regular educational environment" carry particular weight in light of the "the IDEA's imperative that, to 'the maximum extent appropriate,' public schools provide students with disabilities an education in the 'least restrictive environment' possible." *Z.B.*, 888 F.3d at 528 (quoting 20 U.S.C. § 1412(a)(5)(A)). Absent a defect in A.H.'s IEPs, striking the appropriate balance between quantifiable progress reflected in formal evaluations with the unquantifiable benefits obtained from being among nondisabled peers is an "educational policy[]" judgment that school officials are best suited to make. *See Davis*, 244 F. Supp. 3d at 38 (quoting *Rowley*, 458 U.S. at 206); *cf. A.D.*, 2022 WL 683570, at *8 ("IDEA's mandate to place a disabled student in their least restrictive environment must be balanced with the requirement that an IEP be 'reasonably calculated to enable a child to make progress appropriate in light of their circumstances.'" (citation modified) (quoting *Endrew F.*, 580 U.S. at 399)).

For those reasons, the undersigned concludes that the lack of progress on which Plaintiff relies is insufficient to show that A.H.'s IEPs were inappropriate insofar as they did not call for placement in a more restrictive environment.

30

2.    *Behavioral Intervention Plan*

Plaintiff next challenges the hearing officer's conclusion that the District's failure to update A.H.'s behavior intervention plan did not deny him a FAPE.  Because the IDEA does not impose expiration dates on behavioral intervention plans and A.H.'s behavior was adequately addressed in his IEPs in any event, the undersigned agrees with the hearing officer that A.H. was not denied a FAPE.

When a child's "behavior impedes the child's learning or that of others," the school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. § 1414(d)(3)(B)(i).  School districts often meet this requirement "through a functional behavior analysis and its 'end product,' a behavioral intervention program." *Simms v. District of Columbia*, No. 17-cv-970, 2018 WL 4761625, at \*14 (D.D.C. July 26, 2018), *report & recommendation adopted*, 2018 WL 5044245 (D.D.C. Sep. 2018).  Neither a functional behavior analysis nor behavioral intervention plan is required by the IDEA, however, unless the student "is removed from the child's current placement" for serious disciplinary infractions.  *Cundiff-Enoch v. District of Columbia*, No. 22-cv-3713, 2024 WL 396451, at \*10 (D.D.C. Feb. 2, 2024), *report & recommendation adopted*, 2024 WL 2279459 (D.D.C. Mar. 28, 2024); *see also* 20 U.S.C. § 1415(k)(1)(G) (listing infractions such as possessing a weapon or illegal drugs).  If the school district does not provide a behavior intervention plan, it may provide a FAPE by ensuring that the "student's IEP otherwise adequately addresses his behavioral issues." *Simms*, 2018 WL 4761625, at \*14.

Here, A.H. received a functional behavior analysis in 2021 based on his behaviors of "being off-task and talking" during class.  ECF No. 11-1 at 11.  Based on that functional behavior analysis, a behavioral intervention plan was developed for A.H. in early 2022.  *Id.*  Although the behavioral intervention plan anticipated an annual review, no review was ever conducted.  *Id.*  The District

31

.. 

instead continued using the 2021 behavioral intervention plan in subsequent years. *See id.* At the due process hearing, Plaintiff challenged the District's failure to update A.H.'s behavioral intervention plan. ECF No. 14-1 at 18–19. The hearing officer concluded that the failure to update A.H.'s behavioral intervention plan did not deny A.H. a FAPE because the anticipated review date was "not binding and there was no indication that a lack of further [behavior intervention plans] caused problems for" A.H. ECF No. 11-1 at 17. Plaintiff challenges that conclusion here. ECF No. 14-1 at 18–19.

Although the IDEA requires IEPs to be reviewed at least annually, *see* 20 U.S.C. § 1414(d)(4)(A)(i), no such requirement exists for behavioral improvement plans. "Neither the IDEA nor its implementing regulations sets a timeline for reevaluation and revision of [behavioral intervention plans]." *T.M. v. District of Columbia*, 75 F. Supp. 3d 233, 246 (D.D.C. 2014). Instead, the IDEA requires only that the school district "consider the use of positive behavioral interventions and supports" when a child's "behavior impedes the child's learning or that of others." 20 U.S.C. § 1414(d)(3)(B)(i). Here, no one disputes that the District complied with that requirement by conducting a functional behavior analysis in 2021 and implementing a behavioral intervention plan in early 2022. ECF No. 11-1 at 11. Nor does Plaintiff claim that any provision of that behavioral intervention plan was, or later became, inadequate to meet A.H.'s needs. Plaintiff's only contention is that A.H.'s behavioral intervention plan was not "appropriate" because it was not "updated" within a year of its adoption. ECF No. 14-1 at 19. Because behavior intervention plans need not be updated annually, that claim necessarily fails. *See T.M.*, 75 F. Supp. 3d at 246.

And even putting aside the behavioral intervention plan, A.H.'s IEP "otherwise adequately addresse[d] his behavioral issues." *See Simms*, 2018 WL 4761625, at *14. A.H.'s 2022 IEP, developed after A.H.'s functional behavior assessment, provided him with two hours per month of

behavior support services.  ECF No. 11-1 at 8.  His 2023 IEP also provided two hours per month of behavioral support services.  *Id.*  Even though the District never updated A.H.'s behavior intervention plan, the District increased his behavior support services to four hours per month in his 2024 IEP.  *Id.*  These behavior support services included one-on-one or small-group counseling sessions with a school social worker.  *See id.* 679, 796, 800–802.  Though not a panacea, his school social worker testified that A.H. "engaged the strategies [provided to him] positively" and that his behavior "was coming along."  *Id.* at 804–05.  Nor does Plaintiff point to any evidence that the behavior support services provided in A.H.'s IEP were inadequate to meet his needs.  Indeed, in a finding unchallenged by Plaintiff, the hearing officer concluded that A.H. "could make appropriate progress with the [behavior support services] provided."  ECF No. 11-1 at 16.  Accordingly, the undersigned finds that A.H.'s behavior was adequately addressed in his IEPs.  *See Robles v. District of Columbia*, No. 21-cv-02568, 2022 WL 3700947, at *11 (D.D.C. Aug. 26, 2022) (finding no violation where the student's "IEPs implemented strategies that showed continued success").

The undersigned therefore concludes that the District did not deny A.H. a FAPE by failing to update his behavior intervention plan.

### 3.    *Extended School Year Services*

Under the IDEA, school districts "must ensure that extended school year services are available as necessary to provide a FAPE."  34 C.F.R. § 300.106(a)(1).  As the name suggests, extended school year services are services provided to the student outside of the regular school year, such as over the summer break.  *Id.* § 300.106(b)(1)(i).  Extended school year services are "necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months."  *Johnson v. District of Columbia*, 873 F. Supp. 2d 382, 386 (D.D.C. 2012) (quoting *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 537–38 (4th Cir. 2002)).  Plaintiff asks the Court to

reverse the hearing officer's conclusion that A.H. was not entitled to extended school year services in his 2023 and 2024 IEPs. ECF No. 14-1 at 15–18. For the following reasons, the undersigned agrees with Plaintiff that the hearing officer's reasoning is insufficient but finds that a remand to the hearing officer for further consideration of that issue is appropriate.

The IDEA mandates that "a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i). That decision must be set forth in writing and provide both findings of fact and law. *See id.* § 1415(h)(4). Among other things, that requirement helps ensure that there is an adequate "basis for review by the court in accord with IDEA," which depends in large part on the hearing officer's "assessment of the evidence." *Options Pub. Charter Sch. v. Howe ex rel. A.H.*, 512 F. Supp. 2d 55, 57 (2007). That is especially so where evidence introduced at the hearing "undercut[s] [the hearing officer's] conclusion." *E.G.W. v. District of Columbia*, No. 22-cv-1139, 2025 WL 3019127, at *4 (D.D.C. Oct. 29, 2025). Accordingly, where there is an "absence of pertinent findings in the administrative record," the "court may determine that the 'appropriate' relief is a remand to the hearing officer for further proceedings." *Reid*, 401 F.3d at 526; *accord McNeil v. District of Columbia*, 217 F. Supp. 3d 107, 115–16 (D.D.C. 2016).

A.H.'s 2022 IEP provided him with extended school year services. ECF No. 11-1 at 8. But his 2023 and 2024 IEPs did not. *Id.* at 9. At the due process hearing, Plaintiff contended that eliminating A.H.'s extended school year services denied him a FAPE. *Id.* at 14. To support that argument, Plaintiff, among other things, called an expert on special education to testify. *Id.* at 592. Plaintiff's expert testified that A.H.'s well-below grade-level assessments in reading, writing, and math were "indications that [A.H.] was making [*sic*] regression." *Id.* at 645. Plaintiff's expert opined that the District's decision not to provide extended school year services was "just not

34

appropriate for [A.H.] based off . . . the data they had available." *Id.* at 654.  And Plaintiff's expert

concluded:  "I think [A.H.] warranted [extended school year services]." *Id.*  After setting forth the

correct legal standard, the hearing officer provided the following analysis, excerpted in full:

> Here, for 2023 and 2024 ESY, A.H.'s IEP team determined that there would
> be no impact on a critical skill, no likelihood of significant regression, and no un-
> reasonable amount of time to recoup critical skills, which [Plaintiff] did not suc-
> cessfully rebut at the due process hearing.  [A.H.] was in summer school in 2023
> and obtained credit recovery instead.

*Id.* at 15.  That reasoning falls short for several reasons.

To begin, despite concluding that Plaintiff failed to "rebut" the IEP team's determination,

the hearing officer ignored completely Plaintiff's expert witness, who testified that A.H. required

extended school year services to receive a FAPE.  That was "material testimony" that "[t]he IDEA

required the Hearing Officer to address." *See McNeil*, 217 F. Supp. at 115.  To be sure, the "hearing

officer is entitled to make reasonable credibility determinations." *Wimbish v. District of Columbia*,

381 F. Supp. 3d 22, 29 n.5 (D.D.C. 2019) (citation modified) (quoting *McAllister v. District of

Columbia*, 45 F. Supp. 3d 72, 77 (D.D.C 2014)).  And based on those credibility determinations,

the hearing officer may discount Plaintiff's expert.  But the hearing officer must make clear that

such testimony was considered and discounted rather than simply ignored.  *See E.G.W.*, 2025 WL

3019127, at *4.  Here, the hearing officer's decision fails even to acknowledge that testimony.  Nor

did he explain what testimony and evidence he *did* find persuasive.  That alone warrants a remand

for the hearing officer  "to complete the record for this court's review." *See id.*; *see also McNeil*,

217 F. Supp. 3d at 116–17 (remanding for hearing officer to consider ignored testimony).

What reasoning the hearing officer did provide, moreover, misses the mark.  As noted

above, extended school year services are "necessary to a FAPE when the benefits a disabled child

gains during a regular school year will be significantly jeopardized if he is not provided with an

educational program during the summer months." *Johnson*, 873 F. Supp. 2d at 386 (quoting *MM*,

303 F.3d at 537–38).  The hearing officer correctly restated this standard.  ECF No. 11-1 at 15.  But nowhere did the hearing officer *apply* that standard and explain why A.H. was not likely to suffer regression.  Rather, the hearing officer seemed to reason that extended school year services were unnecessary because A.H. received "credit recovery [summer classes, which allow a student to retake a class over the summer that they previously failed to receive the credit] instead."  *Id.*  Yet students at risk of substantial regression are entitled to extended school year services, not credit recovery classes.  *See* 34 C.F.R. § 300.106(a)(1).  And regardless, as the hearing officer acknowledged, A.H. received credit recovery classes only in 2023, not 2024.  ECF No. 11-1 at 9.  So even if credit recovery classes could be substituted for extended school year services, that does not explain why A.H. was offered *neither* in 2024.

Most fundamentally, though, the hearing officer's decision appears improperly to defer to the decision of A.H.'s IEP team.  *See* ECF No. 11-1 at 15 (reasoning A.H.'s "IEP team determined" extended school year services were not necessary).  The issue before the hearing officer was not *who* made the decision; the question was whether that decision was "*reasonable*" in light of the facts known at the time.  *See Endrew F.*, 580 U.S. at 399.  And the fact that the decision was made by the IEP team does not automatically make it reasonable.  Such a rule would run roughshod over the procedural protections afforded by the IDEA's reticulated administrative and judicial review scheme.  *See* 20 U.S.C. § 1415.  The IDEA, among other things, guarantees students and their parents "an *impartial* due process hearing" and a decision "made on *substantive* grounds based on a determination of whether the child received a free and appropriate public education."  *See id.* § 1415(f)(1)(A), (E)(i) (emphasis added).  Finding otherwise would be contrary to the IDEA's command that "the hearing officer may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions"—such as an IEP team that

under the IDEA must include a "representative of the local education agency." *Reid*, 401 F.3d at 526 (quoting 20 U.S.C. § 1414(d)(1)(B)(iv)). The hearing officer's apparent deference to the A.H.'s IEP was therefore error.

Citing the District's own witness's testimony, the District contends that "the hearing officer weighed the record evidence presented at the hearing and found DCPS's witness to be persuasive." ECF No. 25 at 7. That may well be true. But nowhere is there any record of the hearing officer "weigh[ing] the record evidence" or explaining that he "found DCPS's witness to be persuasive." Instead, the hearing officer provided two conclusory sentences that provide little insight into his view of evidence that even the District concedes was "mixed," ECF No. 20 at 17 (citation omitted). And that is why remand is the proper remedy. A cold administrative record is not conducive to weighing conflicting evidence and evaluating witness credibility, as would be required to resolve Plaintiff's challenge. In this circumstance, the undersigned "determine[s] that the 'appropriate' relief is a remand to the hearing officer for further proceedings." *Reid*, 401 F.3d at 526.

Accordingly, the matter should be remanded for the hearing officer to evaluate the evidence and testimony on the record and determine whether, based on that evidence, A.H. was entitled to extended school year services.

### C. Remedial Challenge

Plaintiff finally challenges the compensatory education award entered by the hearing officer. She argues that the hearing officer impermissibly reduced the award based on the extent of her success on the merits. ECF No. 14-1 at 11. And she argues that the hearing officer failed adequately to tailor the award to A.H.'s particular needs. *Id.* at 10–11. She asks the Court to enter the award she sought below—2,500 hours of academic tutoring, 200 hours of psychological counseling, and 100 hours of mentoring. *Id.* at 13. For the following reasons, the undersigned agrees that the hearing officer erred but finds that remand is the appropriate remedy.

When a student is denied a FAPE, the hearing officer "has 'broad discretion to fashion an appropriate remedy.'" *B.D. v. District of Columbia*, 817 F.3d 792, 797–98 (D.C. Cir. 2016) (quoting *Boose v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015)). Exercising that "equitable authority," the hearing officer may "order 'compensatory education'—that is, education services designed to make up for past deficiencies in a child's program." *Boose*, 786 F.3d at 1056 (quoting *Reid*, 401 F.3d at 522–23). A compensatory education award "must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid*, 401 F.3d at 524. "In other words, compensatory education aims to put [the student] in the position he would be in absent the FAPE denial." *B.D.*, 817 F.3d at 798.

Determining the proper compensatory education award requires an "individualized determination" based on "a 'qualitative, fact intensive' inquiry 'tailored to the unique needs of the disabled student.'" *Kelsey v. District of Columbia*, 85 F. Supp. 3d 327, 337 (D.D.C. 2015) (quoting *Branham v. District of Columbia*, 427 F.3d 7, 9 (D.C. Cir. 2005)). The D.C. Circuit has thus rejected the use of any "hour-for-hour formula," "cookie-cutter approach," "lump sum award," or "mechanical hour-counting" when devising a compensatory education remedy. *Reid*, 401 F.3d at 523–24. Instead, the D.C. Circuit has "emphasized repeatedly that this inquiry must be qualitative, fact-intensive, and above all tailored to the unique needs of the disabled student." *Branham*, 427 F.3d at 9. Thus, the hearing officer must "evaluate[] the expert testimony and the probative evidence to determine how to place this specific [student] in the position she would have occupied but for the failure of [the school district] to provide a FAPE." *Kelsey*, 85 F. Supp. 3d at 337.

The hearing officer's compensatory education award does not meet that standard. Rather than conduct the required "'qualitative, fact intensive' inquiry 'tailored to the unique needs of the

38

disabled student,'" *Kelsey*, 85 F. Supp. 3d at 337 (quoting *Branham*, 427 F.3d at 9), the hearing officer awarded 225 total hours of compensatory education with nothing more than bald assurances that the award was "[b]ased on experience and careful analysis" and "tailored to address A.H.'s unique needs," ECF No. 11-1 at 19. Nowhere did the hearing officer explain what A.H.'s "unique needs" were, *Branham*, 427 F.3d at 9, or how the award "aims to put [A.H.] in the position he would be in absent the FAPE denial," *B.D.*, 817 F.3d at 798. Nor did he cite any "expert testimony" or "probative evidence" to support his calculation. *See Kelsey*, 85 F. Supp. 3d at 337. On the contrary, the *only* evidence the hearing officer cited in the discussion of compensatory education was *Plaintiff's* expert's testimony that A.H. needed 2,800 total hours—which was rejected given Plaintiff "was successful on only certain claims." ECF No. 11-1 at 19.

That last point is particularly concerning. In the hearing officer's view, a "significant adjustment" to Plaintiff's expert's proposal was "required based on the fact that [Plaintiff] was successful on only certain claims." *Id.* Plaintiff contends—not without cause—that the hearing officer reduced the compensatory education award based on the degree of her success on the merits. ECF No. 14-1 at 11. To be sure, compensatory education must be calibrated to the degree of harm shown, meaning that a proposal tailored to a greater harm may be reduced if only a limited harm is proven. *See Reid*, 401 F.3d at 524. But often there is not a one-to-one correlation between the Plaintiff's degree of success and the harm suffered by the student. *See T.F. ex rel. Ellern-Feldman v. District of Columbia*, 23-cv-3612, 2025 WL 947524, at *8 (D.D.C. Mar. 2025) (noting that the hearing officer "appeared to overlook that many of the claims on which [the plaintiff] did not prevail related to wholly procedural violations of the IDEA"). Thus, reducing a compensatory award in proportion to a Plaintiff's success on the merits, untethered to the harm to the student, is exactly the sort of "'mechanical' calculation" that the D.C. Circuit has prohibited. *See B.D.*, 817

39

F.3d at 799 (quoting *Reid*, 401 F.3d at 524).  On remand, the hearing officer should ensure the compensatory education award is based on the extent of A.H.'s harm, not Plaintiff's success.

In defense of the hearing officer's decision, the District marshals evidence and reasoning that appear nowhere in the hearing officer's calculation of the award.  The District notes that Plaintiff's expert testified "that two to three hours per week of tutoring may be sufficient."  ECF No. 20 at 24.  But nowhere did the hearing officer explain how this testimony factored into the lump sum award he ordered.  Nor, in any event, does it appear to support the hearing officer's calculation. When pressed by the hearing officer during his questioning about how "a young man" would feel about the "daunting" prospect of receiving 2,500 hours of compensatory education, Plaintiff's expert responded:  "I still think he would need two to three [hours] a week until when he turns 23 because he's currently 16, 17."  ECF No. 11-1 at 713.[7]  Even setting aside the framing of compensatory education as if it were a term of imprisonment at hard labor, two to three hours per week from age seventeen to twenty-three would still be 520 (2 hours x 52 weeks x 5 years) to 780 (3 hours x 52 weeks x 5 years) total hours of compensatory education—far more than the 225 hours awarded by the hearing officer.   So even assuming the hearing officer based his calculation on the testimony the District cites, it still doesn't add up.

Grasping at straws, the District also suggests that "[t]he hearing officer *evidently intended* for his remedy to address [A.H.'s] needs over the course of his final two years of high school, not post-graduation."  ECF No. 25 at 12 (emphasis added).  But no such reasoning appears in the hearing officer's calculation of the compensatory education award.  And it would not save the hearing officer's decision even if it did.  A student's entitlement to compensatory education does

---

[7] Here is the full quote from the hearing officer's questioning:  "I hear what you're saying and would like him to have lots of education if this all goes to conclusion, but for a young man, you know, looking at 2500 hours is pretty daunting."  ECF No. 11-1 at 713.

not terminate with the turning of the tassel.  *See Brooks v. District of Columbia*, 841 F. Supp. 2d 253, 258–60 (D.D.C. 2012).  This court has thus rejected the argument that "graduation from high school precludes the Court from ordering the defendant to provide [the student] with compensatory education."  *Id.* at 260.  "While the DCPS is under no obligation to provide continued [IDEA]-related services to disabled children who have received a high school diploma, the Court may nonetheless order the DCPS to provide compensatory education to a student who has been deprived of her statutory rights."  *Id.* at 258.  "Federal courts have consistently held," therefore, "that compensatory education may continue beyond [the expiration of the IDEA's protection] to make up for the denial of FAPE during the statutory period."  *Anthony v. District of Columbia*, 463 F. Supp. 2d 37, 44 n.6 (D.D.C. 2006); *accord T.F.*, 2025 WL 947524, at *9.

Although Plaintiff asks the Court to order her requested compensatory education award, the undersigned believes that "the best course of action is to remand this case to the Hearing Officer so he may order in the first instance a remedy that 'aims to place [A.H.] in the same position he would have occupied but for'" the violations of the IDEA he ultimately finds.  *T.F.*, 2025 WL 947524, at *8 (citation modified) (quoting *Reid*, 401 F.3d at 524); *see also id.* at *9–10 (remanding where "the only explanation the Hearing Officer gave for making th[e] specific award was that he had 'reduced' the amount requested by [the plaintiff's] expert because she 'requested compensatory services for violations that were not proved'").  On remand, the hearing officer should consider the evidence before him and make an "individualized determination" based on "a 'qualitative, fact intensive' inquiry 'tailored to the unique needs of the disabled student.'"  *Kelsey*, 85 F. Supp. 3d at 337 (quoting *Branham*, 427 F.3d at 9).  And he "should more carefully link his compensatory education award to specific facts in the record, including by analyzing factors such as the length of time [A.H.] was denied a FAPE, the specific services he was denied, and the progress he could

have made absent the District's violations of the IDEA." *T.F.*, 2025 WL 947524, at *8 (citing *Reid*, 401 F.3d at 524).

## IV.    CONCLUSION

For those reasons, the undersigned recommends denying in part and granting in part Plaintiff's motion for summary judgment, ECF No. 14, denying in part and granting in part Defendants' cross-motion for summary judgment, ECF No. 20, and remanding this matter to the hearing officer for further consideration of whether A.H. was denied a FAPE because his 2023 and 2024 IEPs did not provide extended school year support services and of the amount of compensatory education to which A.H. is entitled.

*        *        *        *        *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objection.  The parties are further advised that failure to file timely objection to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendations.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  May 12, 2026

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE